United States District Court
Southern District of Texas
**ENTERED**
June 28, 2019
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **CESAR CUELLAR, SR.**, *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 5:17-CV-76** |
| | § | |
| **PRISCILLA HERNANDEZ**, *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## REPORT AND RECOMMENDATION

Cesar Cuellar, Jr., the twenty-five-year-old son of Plaintiffs Cesar Cuellar, Sr. and Dora Cuellar, was shot and killed by a Laredo police officer during a welfare check at his home. Consequently, Plaintiffs filed this civil rights action against the two involved officers and the City of Laredo under 42 U.S.C. § 1983 and Texas wrongful death and survivorship statutes.[1] Before the Court is Defendant's Motion for Summary Judgment. (Dkt. No. 24). Plaintiffs have filed a Response. (Dkt. No. 26). On February 12, 2019, Defendant's motion was referred to the undersigned for findings of fact and recommendations of law. (Dkt. No. 35). Having considered the evidence,[2] the parties' arguments, and the applicable law, the Court will recommend that Defendants' Motion for Summary Judgment be **GRANTED in part** and **DENIED in part**. Specifically, the Court will recommend that summary judgment be **GRANTED** as to Plaintiffs' claims against the City of Laredo and Plaintiff Dora Cuellar's bystander claim. The Court will also recommend that summary judgment be **DENIED** as to Plaintiffs' excessive-force claim against Officer Hernandez and

---

[1] Plaintiff Cesar Cuellar, Sr. filed suit as administrator of his late son's estate. (Dkt. No. 1 at 1). Additionally, both parents sue individually as heirs to the estate and "on behalf of all possible wrongful death beneficiaries." (*Id.* at 1).

[2] The Court previously struck from the record Defendants' Exhibits E, F, H, and K, as well as the toxicology report in Exhibit D. (Dkt. No. 34 at 11). Accordingly, these exhibits were not considered for any purpose.

Plaintiffs' invasion-of-privacy claim against Officers Hernandez and Gonzalez.

## **Factual Background**

On November 9, 2015, shortly after 11:00 a.m., Laredo Police Officers Priscilla Hernandez and Estefania Gonzalez were radio-dispatched to Cesar Cuellar's apartment in response to an attempted suicide. (Dkt. No. 24-1 at 3; Dkt. No. 26 at 8–9). The patrol radio alerted the responding officers that Cuellar, a Webb County Sheriff's Deputy,[3] had sent text messages expressing suicidal tendencies and that he "took medication." (Pl. Ex. 1(c) at 0:16-0:25; Def. Ex. G at 0:16-0:25). The officers drove to Cuellar's apartment complex, parked outside his unit, and proceeded to the front door. (Dkt. No. 24-1 at 3; Dkt. No. 26 at 10). What happened next is disputed. Defendants attest that Officer Hernandez knocked on the door several times and announced that they were Laredo Police. (Dkt. No. 24-1 at 3; Dkt. No. 24-2 at 3). After waiting for Cuellar to answer, Officer Hernandez tested the doorknob, discovered that it was unlocked, and went inside with Officer Gonzalez. (Dkt. No. 24-1 at 3; Dkt. No. 24-2 at 3). Plaintiffs, on the other hand, claim that the officers went straight into Cuellar's apartment without first knocking or announcing themselves. Plaintiffs' position is based in part on the testimony of Thelma Hernandez, a neighbor living across the hall, (Dkt. No. 26 at 10–11), who testified in a sworn deposition that though she heard the officers' siren and much of the commotion in her neighbor's apartment, she did not hear the officers knock and announce. (Dkt. No. 26-1 at 114–119). To further support their claim, Plaintiffs note that the squad car's audio recording did not pick up Defendants' asserted knock-and-announce. (Pl. Ex. 2 at 4:14–6:03).

After entering Cuellar's apartment, the officers found the living room and kitchen unoccupied. (Dkt. No. 24-1 at 3; Dkt. No. 26 at 12). Officer Hernandez scanned the scene and noticed a

---

[3] Exactly when the officers learned that Cuellar was a law enforcement officer is a fact in dispute. (Dkt. No. 26 at 21, 27; Dkt. No. 26-1 at 214).

police utility belt on the kitchen counter. (Dkt. No. 24-1 at 3; Dkt. No. 26 at 12). The belt's gun holster was empty, and below it on the floor was a box of ammunition. (Dkt. No. 24-1 at 3). Officer Hernandez next observed that the bedroom door was closed, and she called out asking if anyone was there. (*Id.*). Cuellar responded from inside his bedroom, yelling at the officers to "get the fuck out of my house." (Dkt. No. 24-1 at 4; Dkt. No. 26 at 12). Officer Hernandez asked Cuellar if he had any weapons, and Cuellar answered that he had a gun. (Dkt. No. 24-1 at 4; Dkt. No. 26 at 12–13). Officer Hernandez then instructed Cuellar to put the gun down and come out of the bedroom. (Dkt. No. 24-1 at 4; Dkt. No. 26 at 12–13). Although Cuellar at first refused, he ultimately swung open the bedroom door and stepped out. (Dkt. No. 24-1 at 4; Dkt. No. 26 at 13). The officers saw that Cuellar held a handgun pointed down at his side. (Dkt. No. 24-2 at 3; Dkt. No. 26 at 13). In response, the officers pointed their own duty weapons at Cuellar and commanded him to drop the gun. (Dkt. No. 24-1 at 4; Dkt. No. 24-2 at 3; Dkt. No. 26 at 13).

Around that time, Cuellar's mother, Dora Cuellar, appeared at the front doorway. (Dkt. No. 24 at 10; Dkt. No. 26 at 14–15; Dkt. No. 26-1 at 214). Mrs. Cuellar looked inside and saw the officers standing with their weapons aimed at Cuellar. (Dkt. No. 26-1 at 215). Mrs. Cuellar yelled at the officers not to shoot, saying that she was his mother and that he was a cop. (*Id.*). Officer Gonzalez saw Mrs. Cuellar and yelled at her to get back. (Dkt. No. 24-2 at 4). Officer Hernandez, however, claims not to have noticed Mrs. Cuellar. (Dkt. No. 24-1 at 5).

Mrs. Cuellar and the officers give contradictory descriptions of what immediately followed. According to Officer Hernandez, Cuellar, with his finger on the trigger, turned in her direction and raised his firearm at her. (Dkt. No. 24-1 at 4; Dkt. No. 24-2 at 4). In response, Officer Hernandez fired two shots at Cuellar, striking him in the chest and abdomen. (Dkt. No. 24-1 at 4; Dkt. No. 24-4 at 2). Officer Gonzalez likewise claims that Cuellar raised his gun, but unlike Hernandez, she did not fire at him. (Dkt. No. 24-2 at 4).

3

According to Mrs. Cuellar, however, her son kept his arm at his side and the firearm pointed at the ground. (Dkt. No. 26-1 at 215). By her account, Cuellar never put his finger on the trigger, never turned toward Officer Hernandez, and never raised the firearm. (*Id.*). Instead, he stood frozen in place, looking "paralyzed with fear" when Officer Hernandez shot him. (*Id.*).

What no one disputes is how little time elapsed between when Officer Hernandez commanded Cuellar to drop the gun and when she shot him. Mrs. Cuellar attests that Officer Hernandez fired at Cuellar "very soon" after ordering him to drop his gun. (Dkt. No. 26-1 at 215). Similarly, Officer Gonzalez states that only "a few seconds" passed between when Cuellar exited the bedroom and when Officer Hernandez shot him. (Dkt. No. 24-2 at 4). Moreover, Cuellar's neighbor heard shouts to "put the gun down" contemporaneous with the gunshots. (Dkt. No. 26-1 at 118). This testimony is consistent with the police radio recording. In it, Officer Gonzalez transmitted that Cuellar was barricaded in his bedroom sixteen seconds before announcing "shots fired." (Pl. Ex. 1(c) at 0:03–0:19; Def. Ex. J at 0:03–0:19).

Cuellar died of his injuries that same day. (Dkt. No. 24-4 at 2).

Plaintiffs bring the following claims as a result of this incident: a § 1983 excessive-force claim against Officer Hernandez; a § 1983 invasion-of-privacy, failure to knock-and-announce claim against Officers Hernandez and Gonzalez; § 1983 *Monell* claims against the City of Laredo ("the City") for maintaining policies and customs that violated Cuellar's constitutional rights; and a bystander claim by Dora Cuellar for witnessing her son's shooting. (Dkt. No. 1 at 6–10). Defendants now move for summary judgment on three principal grounds: first, that Plaintiffs' § 1983 excessive-force and invasion-of-privacy claims against Officers Hernandez and Gonzalez are precluded by qualified immunity; second, that Plaintiffs' summary judgment evidence is insufficient to support their § 1983 *Monell* claims against the City of Laredo; and third, that bystander claims

are not permitted under § 1983. (Dkt. No. 24 at 5, 20). The court will evaluate each of these in turn.

## Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the nonmovant bears the burden of proof at trial, the movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but does not have to, negate the elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990). "On summary judgment, a court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *Star Fin. Servs., Inc. v. Cardtronics USA, Inc.*, 882 F.3d 176, 179 (5th Cir. 2018). "In reviewing the evidence, the court must 'refrain from making credibility determinations or weighing the evidence.'" *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)).

## Analysis

### 1.    Qualified Immunity

The affirmative defense of qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When an officer asserts the defense of qualified immunity, the Court conducts a

5

two-part analysis: the officer is entitled to qualified immunity unless Plaintiff can show that (1) the officer's conduct violated a constitutional right, and (2) "the right was 'clearly established'" at the time of the challenged conduct." *Harris v. Jackson Cty., Miss.*, 684 F. App'x 459, 461 (5th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). The standard for evaluating the officer's conduct under the first prong of the inquiry is an objective one that is "based on the viewpoint of a reasonable official in light of the information then available to the defendant." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007). If the officer's conduct violated a constitutional right, then "the dispositive inquiry is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Brumfield v. Hollins*, 551 F.3d 322, 328 (5th Cir. 2008) (internal quotation marks omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The qualified immunity analysis depends only on "the facts that were knowable to the defendant officers" at the time of the relevant conduct; facts the officer learns thereafter are irrelevant to the analysis. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (internal quotation marks omitted) (citing *White v. Pauly*, 137 S. Ct. 548, 550 (2017)).

### a.    Excessive Force

To establish that an officer used excessive force, a plaintiff must show: "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (internal quotation marks omitted) (citing *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009)). An officer's use of deadly force violates a constitutional right unless the officer "reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Id.* That threat must be "immediate." *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 278 (5th Cir. 2015) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). Although the Supreme Court has held that courts must look at the "'totality of the circumstances' when assessing

6

the reasonableness of a police officer's use of force," *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)), the Fifth Circuit has focused the excessive-force inquiry on whether an officer "was in danger at the moment of the threat" that led to the shooting. *Id.* (quoting *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 493 (5th Cir. 2001).

In the Fifth Circuit, the focus of an excessive force inquiry is on "the act that led [the officer] to discharge his weapon." *Reyes v. Bridgwater*, 362 F. App'x 403, 406 (5th Cir. 2010) (internal quotation marks omitted) (quoting *Manis v. Lawson,* 585 F.3d 839, 844–45 (5th Cir. 2009)). Officers are constitutionally permitted to use deadly force on someone who performs an act leading the officer to reasonably perceive an immediate threat either to the officer or to others. *Id.* at 408. Such an act is sometimes called a "*Manis* act." *See, e.g.*, *id.* The Fifth Circuit has found unconstitutional excessive force in the absence of a *Manis* act even when the person had or was believed to have had a gun. *See, e.g.*, *Sanchez v. Fraley*, 376 Fed. App'x. 449, 451–52 (5th Cir. 2010); *Graves v. Zachary*, 277 Fed. App'x. 344, 346 (5th Cir. 2008)).

Where a defendant is known to have a gun, a *Manis* act might be, for example, the act of bringing one's hands together in front of one's waist in what could "reasonably be interpreted as a threatening gesture, as if to grip [a] handgun with both hands in preparation to aim it at the officers." *Ramirez v. Knoulton*, 542 F.3d 124, 131 (2008). Conversely, there is no *Manis* act where a man holding a knife a safe distance away from officers simply fails to comply with officers' orders to drop the weapon. *See Reyes v. Bridgwater*, 362 F. App'x 403 (5th Cir. 2010).

### i.     Violation of a Constitutional Right

Defendants' summary judgment motion proffers several justifications for Hernandez's assertion that Cuellar posed an imminent danger or threat of serious bodily injury or death to the officers at various moments during their encounter with him. Specifically, they claim that:

(1) Although he had been directed to leave the gun in the bedroom, Cuellar exited the bedroom with a loaded gun and his finger on the trigger;

(2) Cuellar refused to drop the gun;

(3) With the gun in his hand, Cuellar turned to face Hernandez; and,

(4) Cuellar began to raise the gun in the officers' direction.

(Dkt. No. 24 at 10–11). Officer Hernandez's sworn declaration specifies a more limited basis for her belief. According to her sworn declaration, Officer Hernandez shot Cuellar because he raised the hand with the gun:

> "As I continued to instruct Mr. Cuellar to drop the weapon, he raised his right hand which was holding the gun in an upward position towards me. Believing that Mr. Cuellar was raising his gun to shoot and kill me, I then fired two shots center mass, as I was trained to do, at Mr. Cuellar."

(Dkt. No. 24-1 at 4).

If Officer Hernandez's sworn statement were uncontested, or if any of the facts asserted in the motion as the bases for her belief were undisputed, then summary judgment would be appropriate. Plaintiffs have provided sufficient evidence, however, to establish a genuine dispute as to whether Cuellar posed the immediate threat that the officers claim he did. Although Cuellar was holding a gun when he stepped out of the bedroom, he was not moving toward Officer Hernandez at the time of the shooting. Pl. Ex. 11 at 215. On the contrary, in the moments before he was shot, Cuellar was still. *Id.* And even if stepping out of his bedroom with a gun in his hand could have been a justifying *Manis* act had he been shot mid-stride, *see Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122 (5th Cir. 2014), that justification ceased the moment that Cuellar stopped moving. *See Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." (internal quotation marks omitted) (quoting *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009))); *see also Rockwell v. Brown*, 664 F.3d 985, 992–93 (5th Cir. 2011)

8

("It is well-established that the excessive force inquiry is confined to whether the officer or another person was in danger *at the moment of the threat* that resulted in the officer's use of deadly force. . . . We need not look at any other moment in time.") (cleaned up).

Under *Manis* and its progeny, the undisputed facts of this case do not justify Officer Hernandez's use of force against Cuellar. At the time he was shot, Cuellar was standing in lawful possession of a handgun in his own home, pointing it toward the floor, unmoving, with his finger off the trigger. That alone is not enough. *See Ramirez*, 542 F.3d at 131. Furthermore, the officers were only there to perform a welfare check. They had no reason to suspect Cuellar of having committed any crime, and the only person Cuellar indicated being a danger to was himself. *See Reyes*, 362 Fed.App'x. at 407 n.5 ("While we have of course found the use of deadly force constitutional in circumstances that do not involve felony arrests . . . the "severity of the crime at issue" is among the factors that comprise the totality of the circumstances under *Graham*.").

Given that Cuellar looked paralyzed with fear, Officer Hernandez may not have allowed Cuellar enough time to comply with her order to drop his weapon, even if he ultimately would not have.[4] "[T]he speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017); *see also Winzer v. Kaufman Cty.*, 916 F.3d 464, 475 (5th Cir. 2019) ("[T]he district court's conclusion that Gabriel 'disregard[ed] their orders to drop his weapon' . . . is contradicted by the video evidence, which shows the officers fired on Gabriel within a second of shouting to 'put that down!' . . . It is far from clear that Gabriel had the opportunity to be deterred by the officers' warnings or to even register their commands.").

---

[4] Plaintiffs go further: they argue that the Second Amendment prohibited Officer Hernandez from disarming Cuellar in his own home. (Dkt. No. 26 at 28–29). Plaintiffs' argument is meritless. *See, e.g.*, Schaefer v. Whitted, 121 F. Supp. 3d 701, 710 (W.D. Tex. 2015) (finding that confiscation of firearms by police does not constitute an independent violation of the Second Amendment).

9

Considering the evidence in the light most favorable to the Plaintiffs, there is a genuine dispute of material fact as to whether Cuellar had his finger on the trigger, whether he turned toward Hernandez, and whether he began to raise the gun in the direction of the officers. Because a reasonable juror could find that Officer Hernandez lacked probable cause under *Manis* to believe that Cuellar posed an immediate threat of harm, the Court must turn to the second prong of the qualified-immunity analysis.

### ii.   Whether the Constitutional Right was Clearly Established

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards,* 566 U.S. 658, 663 (2012)). For the right to be clearly established, there need not be a case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)). In other words, the law "should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. at 742 (2011)). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). To have fair notice, there must be a "controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 563 U.S. at 741)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

10

Because Officer Hernandez violated a constitutional right, the Court must decide whether that right was clearly established at the time that Officer Hernandez shot Cuellar. Thus, the Court must consider the law as it stood on November 9, 2015, the date of the shooting. *See Winfrey v. Rogers*, 901 F.3d 483, 493 (5th Cir. 2018) (citing *al-Kidd*, 563 U.S. at 741). Courts must define clearly established law with particularity. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("We have repeatedly told courts…not to define clearly established law at a high level of generality."). The Supreme Court has rejected generalized formulations, holding as too broad, for instance, that the "rule that a police officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Id.* at 308–9 (cleaned up). In that case, the "correct inquiry" was "whether it was clearly established that the Fourth Amendment prohibited the of-ficer's conduct in the situation she confronted: whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 309 (cleaned up).

Defendants argue that Officer Hernandez did not violate clearly established law because she only shot Cuellar after he "exited his bedroom armed with [his] finger on the trigger, turned[,] and faced Hernandez in a small, confined space." (Dkt. No. 24 at 13). Defendants assert that "[i]t did not violate clearly established law for Hernandez to conclude that at that moment Mr. Cuellar posed an immediate threat of serious bodily harm and that she did not need to wait until Mr. Cuellar raised his weapon." (*Id.*). Citing *Ramirez*, Defendants contend that deadly force is not objectively unreasonable where an armed suspect's "conduct could reasonably be interpreted as defiant and threatening." *Ramirez*, 542 F.3d at 131. The Court is not persuaded by Defendants' interpretation of the law.

By November 9, 2015, Fifth Circuit precedent had clearly established that the Fourth Amendment prohibited an officer responding to a welfare check from shooting a man with no

criminal history in his own home, standing still with a gun at his side and finger off the trigger, posing no immediate threat to the officer or to any others in the area. *Reyes*, 362 Fed. App'x. at 406 (alteration in original) (quoting *Manis*, 585 F.3d at 845); *see also Hostetter*, 2017 WL 2390226, at *6 ("The Fifth Circuit requires the suspect display a threatening '*Manis* act' before it is objectively reasonable to use deadly force.") (internal quotation marks omitted) (quoting *Manis*, 585 F.3d at 844); *Schaefer*, 121 F. Supp. 3d at 716 (finding that an officer violated clearly established law by shooting a civilian who, though carrying a firearm on his person, "did not actually draw the weapon and point it in [the officer's] direction."). This case is similar to *Reyes*, in which the Fifth Circuit articulated that there was no *Manis* act to justify the shooting in that case and reiterated the *Garner* rule that deadly force may not be used where the suspect poses no immediate threat to the officer and no threat to others. *Reyes*, 362 Fed. App'x. at 407–08.

Defendants' reliance on *Ramirez* is unfounded. As discussed above, the undisputed facts in that case established that Ramirez brought his hands together in front of his waist in what could reasonably interpreted as a threatening gesture. *Ramirez*, 542 F.3d at 127–131. But here, the undisputed facts establish no such threatening act.

Thus, under *Manis* and its progeny, no reasonable officer would feel justified in the context of a home welfare check to use deadly force against the home's resident who, though standing with a gun at his side, did not make a threatening gesture or move to use the gun and was not given a fair opportunity to drop the gun.

Considering the evidence in the light most favorable to the Plaintiffs, Cuellar's actions surrounding the shooting cannot reasonably be determined to be defiant or threatening, and he posed no immediate threat to the officers or to others. Thus, Officer Hernandez violated a clearly established right under the Fourth Amendment. Because there are material factual issues concerning Plaintiffs' excessive force claim, the question cannot be decided as a matter of law.

### 2.   Failure to Knock and Announce: § 1983 Invasion of Privacy

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Reasonableness is the ultimate touchstone of the Fourth Amendment." *Trent v. Wade*, 776 F.3d 368, 379 (5th Cir. 2015) (cleaned up). "[A]mong the factors to be considered in assessing the reasonableness of a search or seizure" is an officer's method of entry into a home. *Id.* (citing *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995)). Thus, before police officers can attempt the forcible entry of a dwelling, they "must knock on the door and announce their identity and purpose." *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997) (citing *Wilson v. Arkansas*, 514 U.S. 927 (1995)). This rule incorporates the common-law principles that a resident "should have the opportunity to: (1) comply with the law and obey an officer's lawful demand to enter; (2) 'avoid the destruction of property occasioned by a forcible entry'; and (3) 'pull on clothes or get out of bed.'" *Trent v. Wade*, 776 F.3d 368, 379 (5th Cir. 2015) (quoting *Richards*, 520 U.S. at 393 n.5). These interests will generally require officers to knock and announce their presence before a forcible entry, but "when law enforcement concerns outweigh personal privacy interests," officers are not required to comply with the rule. *United States v. Cantu*, 230 F.3d 148, 151 (5th Cir. 2000). To justify a forcible entry, "the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *United States v. Washington*, 340 F.3d 222, 226 (5th Cir. 2003) (quoting *Richards*, 520 U.S. at 394). Opening an unlocked front door is a forcible entry for purposes of the knock-and-announce rule. *See Lindbrugger v. Abercia*, 363 F.3d 537, 540–42 (5th Cir. 2004) (finding that officers forcibly entered an apartment by "pushing on" a partially opened door).

13

By November 9, 2015, both this rule and its exceptions were clearly established. *See Trent*, 776 F.3d at 383 ("*Wilson* and *Richards* placed the knock-and-announce rule and the justifications for dispensing with it beyond debate.").

Plaintiffs have presented enough circumstantial evidence to raise a factual dispute regarding whether the officers knocked and announced themselves before opening Cuellar's front door. Cuellar's neighbor testified that she overheard the officers' siren and the bedlam inside Cuellar's apartment, including shouts to drop the gun. (Dkt. No. 26-1 at 115–117). The neighbor, however, did not hear the officers knock on Cuellar's front door or announce themselves. (*Id.* at 114–119). Although there is officer testimony to support Defendants' claim that Hernandez and Gonzalez knocked-and-announced before entering the apartment, the neighbor's testimony to the contrary is enough to raise a material factual dispute. *See Hodge v. Laryisson*, 226 F.3d 642, 2000 WL 1029029 (5th Cir. 2000) (unpublished). In this case, a fact finder could reasonably credit the neighbor's testimony over the officers' and conclude that Hernandez and Gonzalez opened Cuellar's front door without first knocking and announcing themselves. Because a reasonable juror could find that the officers entered Cuellar's apartment without first knocking and announcing their presence, and because such a no-knock entry would have violated a clearly established right under the Fourth Amendment, Plaintiffs have presented enough evidence to defeat Defendants' claim of qualified immunity at the summary judgment stage.

Defendants further contend, however, that summary judgment is appropriate on this claim because even if the officers violated the knock-and-announce rule, that violation would not entitle Plaintiff to damages. (Dkt. No. 24 at 15). Defendants cite *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1544 (2017), in support of their argument that "Plaintiffs are not permitted to seek damages suffered as a result of the alleged use of deadly force by claiming a separate, preceding Fourth Amendment violation." (Dkt. No. 24 at 15). But Defendants misunderstand the rule.

*Mendez* merely rejected the provocation rule, whereby plaintiffs cannot assert that an earlier Fourth Amendment violation transforms an objectively reasonable use of force into excessive force; *Mendez* did not foreclose recovery for injuries proximately caused by an analytically separate Fourth Amendment violation. *Mendez*, 137 S. Ct. at 1548. Indeed, in *Mendez* itself, the Court noted that "if the plaintiffs in this case cannot recover on their excessive force claim, that will not foreclose recovery for injuries proximately caused *by the warrantless entry*. The harm proximately caused by these two torts may overlap, but the two claims should not be confused." *Id.*

Defendants' reliance on *Mendez* is flawed in two respects. First, it assumes that Officer Hernandez's use of force was reasonable—a fact that is disputed. Second, Plaintiffs do not contend that the violation of the knock-and-announce rule rendered an otherwise reasonable use of force excessive. Rather, Plaintiffs argue that the no-knock entry, as a separate tort, proximately caused Cuellar's death. Besides *Mendez*, Defendants offer no authority to suggest that Plaintiffs would not be entitled to compensatory damages for injuries proximately caused by a separate Fourth Amendment violation.

But more fundamentally, Plaintiffs do not need to prove that the no-knock entry proximately caused any physical harm in order to prevail at trial. Violation of the knock-and-announce rule establishes a valid cause of action even absent tangible injury. Plaintiffs can recover nominal damages for violations of their constitutional rights even where they cannot prove actual injury. *See Williams v. Kaufman Cty.*, 352 F.3d 994, 1014 (5th Cir. 2003) ("The law is well-established in this Circuit that plaintiffs may recover nominal damages when their constitutional rights have been violated but they are unable to prove actual injury") (citing *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 302 (5th Cir. 2000)).

Because Plaintiffs have raised a genuine dispute of material fact with respect to whether Officers Hernandez and Gonzalez knocked and announced their presence before entering the apartment, Plaintiffs' invasion-of-privacy claim cannot be decided as a matter of law.

**3.     § 1983 *Monell* Claims Against the City of Laredo**

Municipalities and other bodies of local government are considered "persons" who may be sued directly under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Such suits, however, must allege more than *respondeat superior. Id.* at 691. In other words, "a municipality cannot be held vicariously liable for the constitutional torts of its employees or agents." *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir. 1999). Instead, a plaintiff must prove that the municipality "policy" or "custom" caused the plaintiff's injury. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). To prevail on a policy or custom claim under *Monell*, a plaintiff must prove three elements: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Jauch v. Choctaw Cty.*, 874 F.3d 425, 435 (5th Cir. 2017) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

The first element—the existence of an official policy—can be proven in several ways. First, a plaintiff can show a policy that has been "officially adopted and promulgated" by the municipality or by an official with policymaking authority. *Burge v. St. Tammany Parish* (*Burge II*), 336 F.3d 363, 369 (5th Cir. 2003). Second, a plaintiff can show a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* Third, "even a single decision may constitute municipal policy in 'rare circumstances' when the official or entity possessing 'final policymaking authority' for an action 'performs the specific act that forms the basis of the § 1983 claim.'" *Webb v. Town of Saint Joseph*, No. 17-

30267, 2019 WL 2238415, at *3 (5th Cir. May 24, 2019) (quoting *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017), *as revised* (Mar. 31, 2017)).

The second element requires proof of an official policymaker with actual or constructive knowledge of the constitutional violation. *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010). A policymaker is "one who takes the place of the governing body in a designated area of city administration." *Id.* (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). "The policymaker must have final policymaking authority." *Davis v. Tarrant County.*, 565 F.3d 214, 227 (5th Cir. 2009). Whether a particular official has final policymaking authority is a question of state and local law. *Id.* (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

The third element requires proof that the policy or custom was the "moving force" behind the underlying constitutional violation. *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010). To satisfy the moving-force prong, a plaintiff must show "either that the policy itself was unconstitutional or that it was adopted with deliberate indifference to the 'known or obvious fact that such constitutional violations would result." *Webb,* 2019 WL 2238415 at *7 (citing *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) and quoting *Shumpert v. City of Tupelo*, 905 F.3d 310, 316–17 (5th Cir. 2018), *as revised* (Sept. 25, 2018)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410; *see also Valle*, 613 F.3d at 547 ("Deliberate indifference is more than negligence or even gross negligence.").

Section 1983 liability can also be predicated on a local government's failure to train its police officers. These failure-to-train claims trace their roots to *City of Canton v. Harris*, 489 U.S. 378 (1989), in which the Supreme Court held that a local government can be liable under *Monell* for constitutional injuries caused by the inadequacy of a municipality's training program. Such

claims are actionable "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388. In analyzing a failure-to-train claim, "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Roberts v. City of Shreveport*, 397 F.3d 287 (2005) (internal quotation marks omitted) (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998)). It is not enough to allege that an injury could have been avoided had a particular officer received more or better training. *Harris*, 489 U.S. at 390–1. The plaintiff must also prove that the alleged inadequacies directly caused the underlying constitutional violation. *See id.* at 391.

To prevail on a failure-to-train claim, a plaintiff must demonstrate that (1) a local government's training policy procedures were inadequate, (2) the government was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused [the plaintiff's injury]." *See Sanders-Burns v. City Of Plano*, 594 F.3d 366, 381 (5th Cir. 2010). A municipality will be liable for the failure to train its employees only where the municipality shows a "deliberate indifference to the rights of its inhabitants." *Id.* (internal quotation marks omitted) (citing *Harris*, 489 U.S. at 389). To prove deliberate indifference, a plaintiff must show "more than mere negligence." *Id.* (citing *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000). This requires proof that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at 390. Such proof generally requires a plaintiff to show a general pattern of similar violations. *Sanders-Burns*, 594 F.3d at 381 (citing *Davis v. City of Richland Hills*, 406 F.3d 375, 383. Under rare circumstances, proof of a single incident will suffice to show that a municipality was deliberately indifferent if "the highly predictable consequence of a failure to train

18

would result in the specific injury suffered, and…the failure to train represent[s] the moving force behind the constitutional violation." *Id.*

Where officers have completed the requisite state-mandated law-enforcement training, "the plaintiff must show that the legal minimum of training was inadequate." *Sanders-Burns*, 594 F.3d at 382 (citing *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992).

Plaintiffs' complaint sets forth six claims against the City:

(1) Failure to train officers to knock and announce before entering an apartment during a "check welfare" call;

(2) Failure to train officers in responding to potentially suicidal subjects;

(3) Failure to train officer regarding citizens' right [sic] to bear arms in their own homes;

(4) Failure to train officers in crisis intervention techniques;

(5) The City had a policy or practice of using excessive force against citizens who are legally armed in their own homes; and

(6) The City had a policy or practice of using excessive deadly force.

(Dkt. No. 1 at 8). Plaintiffs' complaint aggregates the elements of the failure-to-train and municipal-policy claims, but the requisite elements are nevertheless sufficiently pleaded. (*Id.*). Defendants move for summary judgment on all six of these *Monell* claims. (Dkt. No. 24 at 16). In response, Plaintiffs rephrase certain allegations from their original complaint or recast them as substantively new claims. (Dkt. No. 26). Specifically, Plaintiffs' summary judgment response asserts that the City is liable for the following "policies and training":

(1) Failure to adopt a policy on how to conduct welfare checks;

(2) Failure to adopt a policy regarding the right to bear arms in for self-defense in the home;

(3) Failure to train officers on welfare checks;

(4) Failure to train on the right to bear arms; and

(5) Failure to train officers on the objective reasonableness standard in using deadly force.

(Dkt. No. 26 at 35–41). These modifications have analytically significant consequences. Phrased thus, Plaintiffs' response omits reference to several original claims and recasts others as substantively new causes of action. Claims (1),[5] (4), and (5) of Plaintiffs' complaint are wholly omitted from their response; claims (2)[6] and (3)[7] survive, rephrased; and claim (6) is recast as a failure-to-train officers on the objective reasonableness standard in using deadly force. Under Fifth Circuit precedent, a claim not raised in the complaint but raised only in response to a motion for summary judgment is not properly before the Court. *See Linzy v. Sara Lee Corp.*, No. 1:10-CV-277-SA-DAS, 2012 WL 1190907, at *3 (N.D. Miss. Apr. 10, 2012) (citing *Cutrera v. Bd. of Sup'rs of LSU,* 429 F.3d 108, 113 (5th Cir. 2005); *Saucedo–Falls Kunkle,* 299 F. App'x 315, 318 n.3 (5th Cir. 2008); *Fisher v. Metropolitan Life Ins. Co.,* 895 F.2d 1073, 1078 (5th Cir. 1990).[8]

Defendants have provided summary-judgment evidence on claims (1), (4), and (5) of the complaint sufficient to prevail as a matter of law, and that evidence is not contested by Plaintiffs' response. Because Plaintiffs failed to address Defendants' assertions of fact on these claims, the Court considers Defendants' assertions of fact on these claims undisputed. *See* Fed. R. Civ. P. 56(e)(2). Defendant is therefore entitled to summary judgment on Plaintiffs' claims for failure to train to knock and announce, failure to train on a citizen's right to bear arms in his own home, and

---

[5] Although the response speaks to a failure to train on welfare checks—analyzed separately below—nowhere in its discussion of the *Monell* claims does it mention the City's failure to train officers to "knock and announce."

[6] This claim is recast in the response as a "failure to train officers on welfare checks."

[7] This claim is recast as a failure to adopt a policy regarding the right to bear arms for self-defense in the home." Plaintiff cites to several cases for the proposition that a "failure to adopt a policy" is tantamount to a "policy" under *Monell*. But these cases all flow from *City of Canton v. Harris*, 489 U.S. 378 (1989) or the circuit opinions upon which that case predicated in part its reasoning, and under the *Harris* analysis, the claim is properly brought as a failure to train.

[8] In a splintered body of Fifth Circuit case law, district courts are admonished to treat arguments raised for the first time in a response to a summary judgment motion as a motion for leave to amend the complaint under Fed. R. Civ. P. 15(a). *See, e.g., Riley v. Sch. Bd. Union Par.*, 379 F. App'x 335, 341 (5th Cir. 2010). However, given the posture of this case—Defendant has already filed a responsive pleading and a motion for summary judgment—it would unduly prejudice Defendant to permit Plaintiff to amend his complaint. *See Linzy*, 2012 WL 1190907 at *3 n.6.

policy of using excessive force against citizens legally armed in their own homes. Similarly, Plaintiffs fail to respond to Defendants' motion on Plaintiffs' sixth claim, alleging the City's policy or practice of using excessive deadly force. As with claims (1), (4), and (5), Defendants have provided summary judgment evidence sufficient to prevail as a matter of law, and that evidence is not contested in Plaintiffs' response. Defendants would thus be entitled to summary judgment on this claim too, except that Plaintiffs' response appears to  address these facts—albeit indirectly—in support of a claim for failure to train on the objective reasonableness standard in using deadly force. This latter argument, however, presents a new claim. And as a new claim raised for the first time in Plaintiffs' summary judgment response, it is not properly before the Court. Nevertheless, Plaintiffs have been conflating these two claims since the pleadings stage,[9] and their summary judgment response is likely intended to support their originally alleged claims. Accordingly, the Court will treat both claims as if they were properly before the Court.

Thus, after filtering out the claims for which Plaintiff has failed to raise an issue of fact— and allowing for consideration of Plaintiffs' excessive-force *Monell* claims—only four claims against the City remain in dispute: that it (1) failed to train officers on "check welfare" calls, (2) failed to train officers on the right to bear arms, including the right to bear arms for self-defense in the home, (3) had a policy of using excessive deadly force, and (4) failed to train officers on the objective reasonableness standard in using deadly force. The Court will address each of these in turn.

---

[9] In their complaint, Plaintiffs allege that the City's "policy" of "using excessive deadly force" "was promulgated with deliberate indifference." (Dkt. No. 1 at 8). Though Plaintiffs invoke "deliberate indifference" as if it were an element of municipal-policy claim under *Monell*, the language is borrowed from the failure-to-train analysis. Given this conflation of elements, Plaintiffs presumably intended to raise one claim: a "failure to train" on using excessive deadly force. But instead of alleging only the elements of a failure-to-train claim, Plaintiffs' complaint sets forth a "policy," a "policymaker," and a "moving force" causation in addition to the allegation of "deliberate indifference." (Dkt. No. 1 at 8).

### i.  Failure to Train Officers on "Check Welfare" Calls

Defendants move for summary judgment on Plaintiffs' first *Monell* claim—that the City failed to train officers on "check welfare" calls—on the basis that Plaintiff has failed to show (1) that the state-mandated training standards are inadequate, and (2) that there was a direct causal link between this alleged inadequacy and Cuellar's death (Dkt. No. 26 at 35; Dkt. No. 24 at 17–20).

Defendants concede that LPD has no written policies on how to conduct welfare checks. (Dkt. No. 24 at 17). No policy on welfare checks is necessary, they argue, because City training is legally adequate—the City complies with state-mandated training standards for its officers. (Dkt. No. 24 at 18). This compliance, they contend, is sufficient to defeat Plaintiffs' failure-to train claim. (*Id.*). Defendants' position oversimplifies the issue. *Compare Conner v. Travis County*, 209 F.3d 794, 798 (5th Cir. 2000) (granting summary judgment to defendants who had received basic, state-mandated medical training in the absence of any other evidence of inadequate training), *with Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010) ("We consider compliance with state requirements as a factor counseling against a 'failure to train' finding."). Other courts in the Southern District of Texas have applied *Zarnow*, holding that compliance with state require-ments is relevant, but not dispositive. *See, e.g.*, *Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 754 (S.D. Tex. 2011). Thus, Defendants cannot prevail on this claim simply by proving compliance with state-mandated standards; Plaintiffs may present evidence that the legal minimum of training is inadequate.

Defendants present the baseline training standards through the declaration of Deputy Chief Ricardo Gonzalez, a supervisor of the Laredo Police Department's Office of Public Integrity. (Dkt. No. 24-3). According to Lt. Gonzalez, rather than provide training specifically tailored to welfare checks, the department "relies on…Crisis Intervention Training to guide police officers in the

performance of welfare checks." (*Id.* at 4). Crisis Intervention Training (CIT) is a mandatory course "about mental health crisis as it pertains to law enforcement," and has been approved by the Texas Commission on Law Enforcement (TCOLE).[10] (*Id.* at 3). Lt. Gonzalez also submitted the CIT curriculum as of 2018, which "has not substantially changed" from the versions in place before Cuellar's death. (*Id.* at 4). Officer Hernandez likewise submitted her own TCOLE training records, which indicate that she completed CIT courses on May 14, 2009 and July 24, 2014. (Dkt. No. 24-1 at 10, 12). To show that the Defendant officers were in compliance with TCOLE stand-ards, Defendants submit the officers' sworn declarations and training transcripts. (Dkt. Nos. 24-1, 24-2).

Moreover, both Defendant officers testified at their depositions that welfare checks are a regular, routine part of their work. (Dkt. No. 261 at 26, 68). Another Laredo police officer, Thelma Hernandez, testified that the police department receives a suicide alert about once a week, and that, on average, she conducts a welfare check once every three months. (*Id.* at 108). Furthermore, La-redo Police Chief Raymond Garner testified that welfare checks are a "recurring situation" for the department. (*Id.* at 131). All four witnesses also stated that the police department has no written policy on how to perform welfare checks. (*Id.* at 36, 68, 107, 133). Officer Thelma Hernandez further testified that this includes having no policy for responding to suicide calls. (*Id.* at 109–110). Lastly, Lt. Gonzalez attests that he was not aware of frequent acts of misconduct during

---

[10] Under Texas law, TCOLE is required to "establish and maintain training programs" for law officers. Tex. Occ. Code Ann. § 1701.251 (West). As another court in this district has observed:

> the Texas Legislature has mandated that TCOLE establish a statewide comprehensive education and training program on civil rights which covers the laws of the state of Texas and of the United States pertaining to peace officers for all licensed law enforcement officers in Texas. All law enforcement officers in Texas receive that training that has been deemed adequate by the State of Texas to prepare officers to competently perform the duties of their office.

*Tolan v. Cotton*, No. 4:09-CV-1324, 2015 WL 5310801, at *3 (S.D. Tex. Sept. 11, 2015).

welfare checks before November 9, 2015 (*Id.* at 4) nor of any deaths attributable to police miscon-

duct during a welfare check. (*Id.*). Because Defendants have shown compliance with state-man-

dated training standards, it is Plaintiffs' burden to show that this training was inadequate.

In response, Plaintiffs assert that the training was deficient because it did not instruct of-

ficers on "their obligation to leave when an exigency ends." (Dkt. No. 26 at 37). To contest the

adequacy of the training, Plaintiffs offer the expert witness report of retired Lieutenant Roger

Clark, a twenty-seven-year veteran of the Los Angeles County Sheriff's Department. (Dkt. No.

26-1 at 203). In his supplemental report, Lt. Clark states,

> [T]hough the TCOLE Basic Peace Officer training discusses exigent circumstances
> justifying warrantless entry, it does not include the critical instruction about what
> officers must do when the exigency is over. They must leave. Offs. Hernandez and
> Gonzalez did not know this essential part of the exigent circumstances analysis,
> which caused them to remain in Dep. Cuellar's apartment even after they knew he
> could communicate with them and that he had not fatally overdosed on pills. Had
> they left immediately, Dep. Cuellar would likely still be alive today.
>
> The Intermediate Arrest, Search & Seizure training also does not cover these topics.
> My review of the course names and the curriculum available on the TCOLE website
> reveals that none of the officers' other training received before Dep. Cuellar was
> shot covers these topics either.

(*Id.* at 211–212). And even assuming the 2018 CIT curriculum has not changed since before 2015,

Lt. Clark opines that it still "does not include the essential topics critical in this case – when exigent

circumstances end and an officer must leave a person's home during a 'check welfare' call." (*Id.*

at 212). Lt. Clark concludes that "the training that the officers received using the TCOLE curricu-

lum is deficient." (*Id.*).

It is not enough for Plaintiffs' expert to point out that TCOLE training omits instruction on

specific topics that could have prevented the alleged injury. *Harris*, 489 U.S. 391. Plaintiffs must

show that the alleged inadequacies arose from the City's deliberate indifference to the need for

more or different training. *Id.* at 390. To support this claim Plaintiffs offer only Lt. Clark's

testimony on the City's alleged omissions.[11] But a single expert's testimony is not enough to prove deliberate indifference. *Conner v. Travis Cty.*, 209 F.3d 794, 798 (5th Cir. 2000) (holding that the testimony of a single expert is generally inadequate to show deliberate indifference on a failure to train claim (citing *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998))). Beyond this affidavit, Plaintiffs make no such showing: they allege no general pattern of similar violations[12] and present no evidence that Cuellar's injuries were the "highly predictable consequence" of the alleged failure to train. Instead, Plaintiffs make only the conclusory argument that failing to leave when the exigency ends "poses such 'obvious' constitutional problems that officers would require explicit policies in training." (Dkt. No, 26 at 38).

Moreover, Plaintiffs fail to show a direct causal link between the failure to train on "check welfare" calls and the alleged constitutional violation. (Dkt. No. 24 at 19–20). Plaintiffs' argument hinges on the fact that the officers entered Cuellar's apartment without a warrant and stayed after he yelled at them to leave. (Dkt. No. 26 at 38). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted). Nevertheless, exceptions apply where "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978)). One such exigency is "the

---

[11] In their statement of the facts, Plaintiffs assert that when the officers reported over the radio that Cuellar, barricaded inside his bedroom, refused to drop his weapon, "Chief Garner testified the officers should have left the apartment, and that it would only take '4 or 5 seconds' for them to do so." (Dkt. No. 26 at 13). To support this proposition, Plaintiffs cite to Chief Garner's Deposition. (Dkt. No. 26-1 at 141). Contrary to Plaintiffs' characterization of his testimony, Chief Garner offered no normative statements on the officers duty to leave. The testimony states only that it would take four or five seconds to walk ten feet, and that the officers "could not leave" because it was "impossible" for them to. (*Id.*).

[12] Indeed, Plaintiffs concede that "Cuellar may have been the only citizen killed for holding his duty weapon in his home." (Dkt. No. 26 at 39).

need to assist persons who are seriously injured or threatened with such injury." *Id.* Under this exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (citing *Mincey*, 437 U.S. at 392).

Plaintiffs do not dispute that a warrantless entry into Cuellar's apartment was justified by exigent circumstances. They do, however, argue that the exigent circumstances dissipated the moment Cuellar yelled for the officers to "get the fuck out." (Dkt. No. 26 at 20). That supposedly signaled to the officers that Cuellar was alive and that everything was all right. (*Id.*). Furthermore, Plaintiffs blame the officers' decision not to leave on the lack of any written policy or training concerning the proper scope of a welfare check. (*Id.* at 38). As Plaintiffs put it: "entering citizens' homes without their consent, then not leaving when the exigency is over, poses such 'obvious' constitutional problems that officers would require explicit policies and training." (*Id.*). Plaintiffs contend that had this training been implemented, the officers would have known to leave Cuellar's apartment the instant they heard him shouting from his bedroom. (*Id.* at 36). This scenario, Plaintiffs assert, would have averted the later shooting. (*Id.*).

"The question of whether exigent circumstances justified a warrantless search has two parts. First, as a factual matter, the jury (or judge in a bench trial) must sit as a finder of fact, deciding which facts (alleged to form the basis for the claim of exigency) are established by the evidence." *Tamez v. City of San Marcos, Texas*, 118 F.3d 1085, 1094 (5th Cir. 1997). "Second, the court must decide, as a matter of law, whether the facts that have been established…create exigent circumstances sufficient to justify a warrantless search." *Id.* The officers' uncontroverted testimony establishes that, after they entered Cuellar's apartment, Cuellar shouted from his bedroom to "get the fuck out." Plaintiffs characterize this as indicating Cuellar "had not lost his faculties, and was alive, well, and not consenting to their presence in his home." (Dkt. No. 26 at 12).

26

Therefore, according to Plaintiffs, the exigency authorizing the officers to enter Cuellar's apartment was over, mandating that they immediately leave. (*Id.*). Plaintiffs further argue that the exigency remained over when Officer Hernandez asked Cuellar whether he had a weapon, and Cuellar told her that he had a gun. (*Id.* at 3). However, contrary to Plaintiffs' contentions, a person posing a suicide risk does not end the exigency simply by shouting to "get the fuck out" and admitting to holding a gun. That behavior does not signal that everything is "well."[13]

The Fifth Circuit established in *Rice v. ReliaStar Life Ins. Co.* that "the threat an individual poses to himself" may permit police officers to enter the individual's home without a warrant and remain there after being asked to leave. 770 F.3d at 1131. As the *Rice* court explained:

> [T]he exigent circumstances that justified Arnold's entry—Rice's suicidal behavior—had not disappeared just because Rice asked them to leave; he was still intoxicated and pointing a gun to his head. We decline to second guess Arnold's decision to remain in Rice's home with the threat of suicide still present.

*Id.* at 1132–33. In this case, Cuellar's words to the officers did nothing to alleviate their suspicion that he might be suicidal. If anything, Cuellar's admission of having a gun reinforced the perception that Cuellar was in danger of harming himself. And even if Cuellar categorically insisted that he was all right, the officers need not have immediately taken him at his word. *See Rice*, 770 F.3d at 1133. Cuellar was still behind his bedroom door when he shouted at the officers, and they had no idea what kind of physical state he was in. Plaintiffs raise an issue of fact, but that issue is not "genuine." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No reasonable juror could find that the exigency had ended when Cuellar, still holding a gun, shouted at the officers to "get the fuck out."

---

[13] Plaintiffs represent in their response that Chief Garner testified that the officers should have left the apartment at this point. (Dkt. No. 26 at 13). This is a mischaracterization of his testimony. (*See* Dkt. No. 26-1 at 141).

Because no reasonable juror could find that Cuellar's death was caused by the failure to train on "check welfare" calls, Plaintiffs' have failed to make the requisite showing on a necessary element of their case. Plaintiffs' claim therefore cannot survive summary judgment and should be dismissed as a matter of law.

### ii.    Failure to Train on the Right to Bear Arms

Defendants move for summary judgment on Plaintiffs' second claim—that the City failed to train officers on the Second Amendment right to bear arms, including the right to bear arms for self-defense in the home—on the basis that Plaintiff has failed to show (1) that the City's policies are inadequate, and (2) that there was a direct causal link between this inadequacy and Cuellar's death. (Dkt. No. 26 at 35–41; Dkt. No. 24 at 17–20).

Defendants assert that between LPD's policy on disarming persons and section 411.207 of the Government Code officers receive sufficient guidance on disarming citizens and confiscating their weapons. (Dkt. No. 24 at 17). Defendants nevertheless concede that the City has no written policy informing the officers that citizens have a right to possess a weapon in their residences. (Dkt. No. 24 at 17). Chief Garner testified at his deposition that the Laredo Police Department does not have any policies concerning the Second Amendment right to bear arms. (Dkt. No. 26 at 139–40). Additionally, Lt. Gonzalez declares, "Regarding a citizen's right to bear arms, the police department does not have a written policy informing the police officer that citizen's [*sic*] have a right to possess a weapon in their residences. I have found that this is a well-known right of citizens that requires no special or additional training." (Dkt. No. 24-3 at 4). Furthermore, Lt. Clark states in his expert report that the TCOLE training curriculum "does not address citizen's [*sic*] rights to bear arms in their own home." (Dkt. No. 26-1 at 211).

In response, Plaintiffs contend that the City's lack of training on the Second Amendment "does not satisfy the City's constitutional obligations." (Dkt. No. 26 at 37). To support their

argument, Plaintiffs assert that the City's policy on "confiscation of weapons" contains no reference to the right to bear arms in the home for self-defense "and appears to justify confiscating legally-owned, self-defense weapons in any circumstance," and the TCOLE curriculum contains no discussion of the Second Amendment. (Dkt. No. 26 at 40–1).

Plaintiffs assertions cannot support a failure-to-train claim. As the Fifth Circuit has noted, "Plaintiffs cannot prevail by styling their complaints about the specific injury suffered as a failure to train claim." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). "The Supreme Court specifically warned against this type of artful pleading" in its seminal failure-to-train case, *City of Canton v. Harris*, 489 U.S. at 397 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

But even if such narrow pleading were permissible, Plaintiffs fail to show how LPD's training program was inadequate. Plaintiffs make only the conclusory argument that failing to train on the Second Amendment fails to satisfy the City's constitutional obligations; beyond this, Plaintiffs offer neither argument nor evidence to support the claim. Plaintiffs make no showing that LPD was "deliberately indifferent" to the need for training on the Second Amendment; the evidence shows only that there was no such training.

Even assuming that Plaintiffs had shown that the training was inadequate, Plaintiffs fail to show how the inadequacy was causally linked to Cuellar's death—and it is difficult to see how they could. One is hard-pressed to imagine a counterfactual in which training on the right to legally own and possess a firearm would keep an officer from using deadly force when faced with an imminent threat to officer safety. Likewise, here, Officer Hernandez shot Cuellar not because she believed that he illegally owned or possessed a firearm: she pulled the trigger because, reasonably or not, she believed that Cuellar posed a threat to her safety. (Dkt. No. 24-1 at 4). Even if she had

been specifically trained on the circumstances under which a citizen may legally own and possess a firearm, based on the summary judgment evidence, Officer Hernandez would still have shot Cuellar. Plaintiffs offer no evidence to the contrary.

Thus, because no reasonable juror could find that a failure to train on the right to bear arms caused Cuellar's death, Plaintiffs' claim cannot survive summary judgment and should be dismissed as a matter of law.

### iii.   Unconstitutional Use of Deadly Force Policy and Failure to Train on the Objective Reasonableness Standard in Using Deadly Force

Plaintiffs' complaint alleges that at the time of Cuellar's death, the City of Laredo had a "policy and/or practice" of "using excessive deadly force." (Dkt. No. 1 at 8). In Plaintiffs' summary judgment response, this allegation forks into two claims as "an unconstitutional use of force policy" and a failure-to-train on "the objective reasonableness standard in deadly force." (Dkt. No. 26 at 16, 37). Both of these claims fail.

As a "policy," Plaintiffs specifically claim that LPD "trained officers that 'if they can articulate' that their 'life is in danger' then they 'can shoot' – regardless of whether the officer's belief is reasonable or not." (*Id.* at 38). Neither argument nor evidence is offered of an officially adopted policy; a persistent, widespread practice so common as to constitute a custom; or a single policy decision by an official with final policymaking authority. Instead, Plaintiffs cite to an excerpt from Chief Garner's deposition to suggest that the police chief impermissibly trained officers using a subjective standard in the use of deadly force. (Dkt. No. 26-1 at 142-144). Although the police chief's testimony raises doubts about his ability to understand the difference between subjective and objective standards, it does not establish a policy under *Monell*. Because Plaintiffs' response cites to no other evidence to support this claim, the Court need not consider whether any such evidence might exist buried in the record. *See Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d

455, 458 (5th Cir. 1998). But even if Plaintiffs had established such a policy, they have identified no evidence that Chief Garner was a municipal policymaker. Plaintiffs have therefore failed to raise a genuine dispute of material fact as to an essential element of their use-of-deadly-force policy claim, and this claim should be dismissed as a matter of law.

Plaintiffs' claim fares no better recast as a failure to train on the objective reasonableness standard in deadly force. Plaintiffs' expert witness, Lt. Clark, states that the TCOLE curriculum is deficient because it does not instruct officers "that a *Manis* act is required before [they] can use deadly force" against individuals holding weapons. (Dkt. No. 26-1 at 211). While this might be enough to contest the adequacy of the TCOLE training, Plaintiffs fail to show that the inadequacy was "so obvious" that the City was deliberately indifferent to the need for different training. *Harris*, 489 U.S. at 390. The summary-judgment response does not point to a single other incident of excessive force by the Laredo Police Department, nor does it offer evidence proving deliberate indifference under the single-incident exception. Although Plaintiffs' expert opines that the curriculum was deficient, he does not state that Cuellar's specific injury was the highly predictable consequence of that deficiency. Nor does Plaintiffs' response cite to any other evidence to satisfy the single-incident exception. Finally, besides the conclusory statement that this "training defect[] was causally connected to" Cuellar's death, Plaintiffs offer no evidence to show a causal nexus between the alleged inadequacies and Cuellar's injury.

Because Plaintiffs fail to raise an issue of fact on this claim, this claim should be dismissed as a matter of law.

### 4.   Bystander Claim by Dora Cuellar

According to the complaint, Mrs. Cuellar seeks damages for the pain and mental anguish of "contemporaneously experiencing the serious bodily injury to her son." (Dkt. No. 1 at 10). Defendants move for summary judgment on this claim, pointing out that bystander claims are not

permitted under § 1983. (Dkt. No. 24 at 20-21). *See Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 172 (5th Cir. 1985). Plaintiffs do not address Mrs. Cuellar's bystander claim in their Response to Defendant's Motion for Summary Judgment. (Dkt. No. 26). Because Plaintiffs fail to raise a dispute of material fact, this claim should be dismissed as a matter of law.

## Conclusion

For the foregoing reasons, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED** in part and **DENIED** in part. Specifically, the Court **RECOMMENDS** that the District Judge **GRANT** summary judgment as to all Plaintiffs' claims against the City of Laredo and Dora Cuellar's bystander claim. However, the Court **RECOMMENDS** that the District Judge **DENY** Defendants' motion for summary judgment as to Plaintiffs' excessive-force claim against Officer Hernandez and Plaintiffs' invasion-of-privacy claim against Officers Hernandez and Gonzalez.

## Notice of Right to Object

Within fourteen days after being served with a copy of this Report and Recommendation, the parties may file written objections to the findings and recommendations proposed above. 28 U.S.C. § 636(b)(1). The District Judge will review *de novo* those portions of the report or specified proposed findings or recommendations to which the party objects. The District Judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by this Court, and may also receive further evidence or recommit the matter to this Court with instructions. *Id.* The District Court need not consider frivolous, conclusive, or general objections. *Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). If a party does not object within fourteen days, the party forfeits its right to District Court review. *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review

by the District Court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of plain error or manifest injustice.

SIGNED on June 28, 2019.

John A. Kazen
United States Magistrate Judge