United States District Court
Southern District of Texas

**ENTERED**

September 16, 2019

David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | | |
|---|---|---|
| CESAR CUELLAR, SR., *et al.,* | § | |
| | § | |
| **Plaintiffs,** | § | |
| VS. | § | CIVIL ACTION NO. 5:17-CV-76 |
| | § | |
| PRISCILLA HERNANDEZ, *et al.,* | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM & ORDER**

This suit arose from the November 9, 2015 shooting death of Cesar Cuellar, Jr. by Laredo Police Department Officer Priscilla Hernandez. Before the Court is Defendants' motion for summary judgment on Plaintiffs' claims against them under 42 U.S.C. § 1983. (Dkt. 24.) The Court referred the motion to Magistrate Judge John A. Kazen for findings and recommendations. (Dkt. 35.) The Magistrate Judge issued his Report and Recommendations (R&R) on June 28, 2019, recommending that Defendants' motion for summary judgment be granted in part and denied in part. (Dkt. 38.) Plaintiffs and Defendants timely filed objections to the R&R. (Dkts. 39–40.)

The Court has conducted a *de novo* review of the portions of the R&R to which the parties objected. *See* 28 U.S.C. § 636(b)(1). The Court now concludes that all of Plaintiffs' objections should be overruled, as should all but one of Defendants'. Only Defendants' objection to the portion of the R&R addressing the second prong of the qualified-immunity inquiry will be sustained. Accordingly, Defendants' motion for summary judgment will be granted as to Plaintiffs' claims against the City of Laredo, Plaintiff Dora Cuellar's bystander claim, and Plaintiffs' excessive-force claim against Defendant Hernandez, but denied as to Plaintiffs' invasion-of-privacy claim against Defendants Hernandez and Gonzalez.

## Legal Standards

### A.      Section 1983

Section 1983 creates a federal cause of action against any person who, acting pursuant to state authority, violates the Constitution or federal law. 42 U.S.C. § 1983; *see Albright v. Oliver*, 510 U.S. 266, 269–71 (1994). To state a constitutional claim under § 1983, "a plaintiff must (1) allege a violation of a right secured by the Constitution . . . and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting *James v. Tex. Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008)).

Along with individual defendants, municipalities and other local government entities are considered "persons" who may be sued directly under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, "a municipality cannot be held vicariously liable for the constitutional torts of its employees or agents." *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir. 1999). Instead, a plaintiff must show that the municipality's own "policy" or "custom" caused his injury. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). To prevail on a policy-or-custom claim under *Monell*, a plaintiff must prove three elements: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002).

The first element—the existence of an official policy—can be proven in several ways. First and most obviously, a plaintiff can point to a policy that has been "officially adopted and promulgated" by the municipality or by an official with policymaking authority. *Burge v. St. Tammany Par. (Burge II)*, 336 F.3d 363, 369 (5th Cir. 2003). Second, a plaintiff can show a

"persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* Finally, "even a single decision may constitute municipal policy in 'rare circumstances' when the official or entity possessing 'final policymaking authority' for an action 'performs the specific act that forms the basis of the § 1983 claim.'" *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019) (quoting *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017)).

The second element of a § 1983 municipal-liability claim requires proof of an official policymaker with actual or constructive knowledge of the constitutional violation. *Pineda*, 291 F.3d at 328. A policymaker is any person "who takes the place of the governing body in a designated area of city administration." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010) (quoting *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). State law determines whether a particular official has final policymaking authority. *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

The third and final element requires proof that the policy or custom was the "moving force" behind the underlying constitutional violation. *Pineda*, 291 F.3d at 328. To satisfy the moving-force prong, a plaintiff must show either that the policy itself was unconstitutional or that it was "adopted with deliberate indifference to the known or obvious fact that such constitutional violations would result." *Shumpert v. City of Tupelo*, 905 F.3d 310, 316 (5th Cir. 2018) (internal quotation marks omitted). Deliberate indifference is a higher standard of fault "than negligence or even gross negligence." *Valle v. City of Hous.*, 613 F.3d 536, 547 (5th Cir. 2010). It requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.

Section 1983 liability may also be predicated on a local government's failure to adequately train its police officers. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). To prevail on a failure-to-train claim, a plaintiff must demonstrate that (1) the local government's "training policy procedures were inadequate, (2) [the government] was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused" the plaintiff's injury. *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).

## B.    Qualified Immunity

Even where a plaintiff has adequately alleged a § 1983 violation, the doctrine of qualified immunity will shield "government officials acting within their discretionary authority from liability" as long as "their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005). Once an official raises a qualified-immunity defense, the burden shifts to the plaintiff, "who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

Courts conduct a two-step inquiry to determine whether qualified immunity applies. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). First, the court determines whether the plaintiff has adequately alleged a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[1] Here, the relevant constitutional protection is the Fourth Amendment right against the use of excessive force. *See Pratt v. Harris Cty.*, 822 F.3d 174, 188 (5th Cir. 2016). To establish an excessive-force claim, a plaintiff must show that (1) he was seized, and (2) he suffered an

---

[1] The Supreme Court has overruled *Saucier* insofar as it mandated the order in which courts must address the two steps of the qualified-immunity inquiry. *Pearson*, 555 U.S. at 232; *see Saucier*, 533 U.S. at 200–01. However, while the *Saucier* protocol is no longer mandatory, it is still the preferred approach. *Pearson*, 555 U.S. at 236.

injury (3) resulting directly and only from a use of force that was both excessive to the need and (4) objectively unreasonable. *Carroll v. Ellington*, 800 F.3d 154, 173 (5th Cir. 2015). The general rule is that *deadly* force violates the Fourth Amendment unless "the officer has probable cause to believe the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

If the plaintiff satisfies the first step of the qualified-immunity inquiry by establishing the violation of a constitutional right, the court must then "ask whether the right was clearly established" at the time of the defendant's alleged misconduct. *Saucier*, 533 U.S. at 201. A "clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011). A court may not, for example, deny qualified immunity on the ground that an officer violated the general rule that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm." *Mullenix*, 136 S. Ct. at 309 (quoting *Garner*, 471 U.S. at 11). While there need not be a case "directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 308 (quoting *al–Kidd*, 563 U.S. at 741). In other words, there must be "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (internal quotation marks omitted).

## C.    Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to a material fact is "genuine" if "the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.*

The movant may satisfy its initial burden by merely pointing out the absence of evidence supporting the nonmovant's case. *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The burden then shifts to the nonmovant to establish a genuine fact issue. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The nonmovant must go beyond the pleadings and identify specific evidence in the record supporting its position. *Id.* at 349–50. Conclusory allegations, unsubstantiated assertions, and improbable inferences are insufficient to defeat a motion for summary judgment. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) (per curiam); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). However, the "court must consider the evidence in the light most favorable to the non-movant, and any reasonable inferences are to be drawn in favor of that party." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

**D.**   ***De Novo* Review of Magistrate Judge's Report and Recommendation**

A magistrate judge may only issue recommendations, not final orders, on dispositive motions. Fed. R. Civ. P. 72(b). If a party timely objects to a magistrate's R&R, the district court must "make a de novo determination of those portions . . . to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989) (per curiam).

## Factual Background

Shortly after 11:00 a.m. on November 9, 2015, Laredo Police Department (LPD) Officers Priscilla Hernandez and Estefania Gonzalez were dispatched to Cesar Cuellar, Jr.'s North Laredo apartment in response to a report of an attempted suicide. (Dkt. 24, Attach. 1 at 3; Dkt. 26 at 8–9.) The patrol radio alerted the officers that Cuellar, a 25-year-old Webb County Sheriff's Deputy, had sent text messages expressing an intent to commit suicide and stating that he had taken an unspecified medication. (*See* Dkt. 24, Attach. 7.) The officers gained entrance to Cuellar's apartment complex by activating the "yelp siren" on their vehicle, parked outside Cuellar's unit, and proceeded to the front door. (Dkt. 24, Attach. 1 at 3, Attach. 2 at 2–3; Dkt. 26 at 10.)

It is at Cuellar's door that Plaintiffs' and Defendants' accounts of the day's events diverge. Plaintiffs, supported by the deposition testimony of Cuellar's across-the-hall neighbor, assert that Officers Hernandez and Gonzalez entered the unlocked apartment without knocking or announcing their presence. (Dkt. 1 at 4; *see* Dkt. 26 at 10, Attach. 1 at 118–19.) Defendants, on the other hand, claim that the officers opened the door only after knocking, announcing their presence, and waiting in vain for a response. (Dkt. 24 at 1, 9.) Because all evidence must be viewed "in the light most favorable to the non-movant," the Court will assume for summary-judgment purposes that Plaintiffs' version of events is accurate. *Distribuidora Mari Jose*, 738 F.3d at 706.

All parties agree that upon entering the apartment, the officers observed Cuellar's utility belt lying on a table and noticed that his service weapon was not in its holster. (Dkt. 1 at 4; Dkt. 3 at 3.) Officer Hernandez also observed a box of ammunition on the floor beneath the kitchen counter. (Dkt. 3 at 3.) The door to Cuellar's bedroom was closed. (Dkt. 24 at 2; Dkt. 26 at 12.)

When Officer Hernandez called out asking if Cuellar needed assistance, Cuellar yelled at the officers to "get the fuck out" of his apartment. (Dkt. 24 at 10; Dkt. 26 at 12.) Officer Hernandez asked if Cuellar had any weapons, and he responded, "Yeah, I have my gun in my hand." (Dkt. 3 at 3; Dkt. 26 at 12.) Hernandez then instructed Cuellar to put the weapon down and come out of the room slowly showing both of his hands. (Dkt. 3 at 3; Dkt. 26 at 13.) When Cuellar refused, the officers decided to retreat and wait for backup. (Dkt. 24 at 10.) Before they could do so, however, Cuellar stepped out of the bedroom holding his duty weapon down at his side. (*Id.*; Dkt. 26 at 13.) Officer Hernandez repeatedly instructed Cuellar to drop the gun, but he did not. (Dkt. 24 at 10.) Just then, Cuellar's mother, Plaintiff Dora Cuellar, entered the apartment, observed the two officers pointing their guns at her son, and shouted at them not to shoot. (*Id.*; Dkt. 26 at 14–15.)

Here again the parties' accounts diverge. According to Plaintiffs' account, which the Court takes as true for purposes of summary judgment, Cuellar remained "frozen" with both arms at his sides and "never moved the gun" or placed his finger on the trigger. (Dkt. 26 at 15.) Defendants, on the other hand, contend that Cuellar "began to raise his arm with the gun in his hand" and his finger on the trigger. (Dkt. 24 at 10.) At 11:10:39 a.m., Officer Hernandez fired two shots at Cuellar, striking him in the chest and abdomen. (Dkt. 1 at 5; Dkt. 26 at 15.) Cuellar was transported to a nearby hospital, where he died from his injuries. (Dkt. 1 at 5; Dkt. 24 at 10.)

Following Cuellar's death, his parents brought this action under 42 U.S.C. § 1983. They assert the following causes of action: (1) an excessive-force claim against Officer Hernandez on behalf of Cuellar's estate; (2) an excessive-force claim against Officer Hernandez on behalf of Cuellar's mother, who witnessed the shooting; (3) an invasion-of-privacy claim against Officers Hernandez and Gonzalez for allegedly failing to knock and announce their presence before

entering Cuellar's apartment; and (4) various *Monell* claims against the City of Laredo for allegedly maintaining a practice of using excessive force and failing to train police officers on several key issues, including crisis intervention. (Dkt. 1 at 6–9.)

In support of summary judgment, the officer Defendants argue that they are entitled to qualified immunity because they did not violate any clearly established constitutional right. (Dkt. 3 at 2–5; Dkt. 24 at 5–16.) As for Plaintiffs' claims against the City, Defendants argue that LPD's training is constitutionally adequate and that the City does not maintain any policies or customs that might give rise to § 1983 liability. (Dkt. 24 at 16–20.) Finally, Defendants contend that Plaintiff Dora Cuellar's claim for emotional injuries must be dismissed because § 1983 does not permit bystander claims. (*Id.* at 20–21.)

In his R&R, Magistrate Judge Kazen recommended that the Court grant summary judgment as to Plaintiffs' claims against the City and Plaintiff Dora Cuellar's bystander claim. (Dkt. 38 at 1.) However, Magistrate Judge Kazen concluded that there remain genuine disputes of material fact regarding the individual officers' conduct that, if ultimately resolved in Plaintiffs' favor, would overcome the officers' qualified immunity. (*Id.* at 12, 15–16.) Thus, he recommended that the Court deny summary judgment as to Plaintiffs' invasion-of-privacy claim against both officers and excessive-force claim against Officer Hernandez. (*Id.* at 1–2.)

Plaintiffs do not contest the Magistrate Judge's conclusion regarding Dora Cuellar's bystander claim, but they object to his findings on the municipal liability claims. First, Plaintiffs claim that he erred by failing to consider the full scope of their summary-judgment evidence. (Dkt. 39 at 1–2.) Second, Plaintiffs challenge the Magistrate Judge's recommendation to dismiss all claims against the City. Plaintiffs allege that their summary-judgment evidence establishes that Cuellar's death resulted directly from the City's failure to train officers on (1) welfare check

calls, (2) citizens' right to bear arms, and (3) the legal standard that governs the use of deadly force. (*Id.* at 2–6.)

Defendants have also filed objections to Magistrate Judge Kazen's R&R, all regarding his findings on the excessive-force claim against Officer Hernandez. (Dkt. 40.) They first contend that there is no genuine dispute as to whether Cuellar turned toward Hernandez before he was shot. (*Id.* at 2–7.) Second, Defendants argue that Magistrate Judge Kazen erred by "denying qualified immunity" without "consider[ing] the reasonableness of Hernandez' action from her perspective during the tense and chaotic situation she confronted." (*Id.* at 11.) Instead, Defendants claim, the Magistrate Judge "engaged in impermissible second-guessing of [t]he Officers['] assessment of the circumstances. (*Id.* at 13.) Third and finally, Defendants object to the Magistrate Judge's finding that, if everything occurred as alleged by Plaintiffs, then Officer Hernandez's use of deadly force violated a clearly established constitutional right. (*Id.* at 16–20; *see* Dkt. 38 at 11–12.) Defendants contend that, even assuming Cuellar did not raise his weapon with his finger on the trigger, Officer Hernandez's choice to fire was both legal and reasonable. (Dkt. 40 at 19.) The Court will address each objection in turn, beginning with Plaintiffs' arguments and proceeding to Defendants'.

## **Discussion**

### A.  **Plaintiffs' Objections**

### 1.  **Scope of Properly Considered Evidence as to Claims Against City**

In their initial complaint, Plaintiffs identified six alleged failings by the City of Laredo that they claimed caused Cuellar's death:

> (1) Failure to train officers to knock and announce before entering a residence during a welfare check;
> (2) Failure to train officers in responding to potentially suicidal individuals;
> (3) Failure to train officers on citizens' right to bear arms in their own homes;

(4) Failure to train officers in crisis intervention techniques;

(5) A policy or practice of using excessive force against legally armed citizens in their own homes; and

(6) A policy or practice of using excessive deadly force.

(Dkt. 1 at 8.) Defendants moved for summary judgment on each of these claims. (Dkt. 24 at 16–20.) However, Plaintiffs' response to Defendants' summary-judgment motion recast or discarded several of Plaintiffs' original allegations against the City. The Magistrate Judge correctly observed that Plaintiffs' response omitted any reference to Claims 1, 4, and 5 of the complaint. (Dkt. 38 at 20.) Because Defendants had provided summary-judgment evidence on those three claims sufficient to prevail as a matter of law, the Magistrate Judge concluded that Defendants were entitled to summary judgment on them. (*Id.*) He then proceeded to carefully evaluate Plaintiffs' contentions as to each of the three remaining claims. (*Id.* at 22–30.)

Plaintiffs' objection to this approach is difficult to parse, but they appear to argue that the Magistrate Judge mistakenly neglected some (unspecified) components of their summary-judgment evidence by misclassifying what they call their "new factual theories" as "new legal *claim*[s]." (Dkt. 39 at 1.) The R&R does note that, "[u]nder Fifth Circuit precedent, a claim not raised in the complaint but raised only in response to a motion for summary judgment is not properly before the Court." (Dkt. 38 at 20.) *See Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005). However, this statement merely provides legal context for the R&R's discussion of Plaintiffs' rephrased claims. The Magistrate Judge did not conclude that Plaintiffs had actually raised any *new* claims in their summary-judgment response. Rather, he concluded that they had *omitted* Claims 1, 4, and 5 and significantly recast their remaining allegations. (Dkt. 38 at 20.) That recasting did not prevent the Magistrate Judge from considering Plaintiffs' evidence on the remaining claims; it just made his job harder by confusing the issues. He did not discard any of Plaintiffs' claims or disregard any of their evidence. In short, the Court agrees with the R&R's

analysis of Plaintiffs' summary-judgment response and finds no merit in Plaintiffs' first objection.

### 2.    Factual Disputes Regarding Claims Against City

The remainder of Plaintiffs' objections seek to identify genuine disputes of material fact regarding the City's alleged failure to train officers on (1) how to determine when the exigency justifying a welfare check has ended, (2) the right to bear arms, and (3) the objective reasonableness standard that governs the use of deadly force. (Dkt. 39 at 2–6.) Having reviewed the record and the applicable law, the Court concludes that the Magistrate Judge was correct in finding that there are no remaining factual disputes whose "resolution in favor of one party might affect the outcome of the lawsuit." *Hamilton*, 232 F.3d at 477.

### i.    Failure to Train on Welfare Checks

To prevail on a failure-to-train claim, a plaintiff must demonstrate that (1) the local government's "training policy procedures were inadequate, (2) [the government] was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused" the plaintiff's injury. *Sanders-Burns*, 594 F.3d at 381. The Magistrate Judge concluded that even if Plaintiffs could prove that the state-mandated training on welfare checks was inadequate, they had not shown deliberate indifference or a direct causal link between the inadequate training and Cuellar's death. (Dkt. 38 at 24–28.)

Plaintiffs now argue that LPD Chief Raymond Garner's deposition testimony raises a genuine dispute of material fact about (1) whether the City was deliberately indifferent to the need for more or different training, and (2) whether that lack of training directly caused Cuellar's death. (Dkt. 39 at 2–3.) *See Harris*, 489 U.S. at 390. Both these objections rely on Plaintiffs' underlying factual assertion that after Cuellar had confirmed he was alive, "no exigent

circumstances justified the officers' continued presence" in his home. (Dkt. 39 at 4–5.)

This alleged factual dispute is not genuine. As the Magistrate Judge correctly concluded, "no reasonable juror could find that the exigency had ended when Cuellar, still holding a gun, shouted at the officers to 'get the fuck out.'" (Dkt. 38 at 27.) The law is clear that officers may stay in a suicidal subject's home even after being told to leave if the subject appears to remain a threat to himself or others. *See, e.g.*, *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1132–33 (5th Cir. 2014); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 562 (7th Cir. 2014); *Roberts v. Spielman*, 643 F.3d 899, 904 (11th Cir. 2011) (per curiam). This is especially true when the subject has barricaded himself with a loaded firearm after claiming to have taken an overdose of prescription medication. *Cf. Rice*, 77 F.3d at 1132–33 ("[T]he exigent circumstances that justified [officers'] entry—Rice's suicidal behavior—had not disappeared just because Rice asked them to leave; he was still intoxicated and pointing a gun to his head.").[2]

Because there is no genuine factual dispute about the presence of exigent circumstances, Plaintiffs cannot show that Cuellar's death was a direct result of the City's allegedly deficient training on exigent circumstances. (*See* Dkt. 39 at 4–5.) In fact, a training program that taught officers to leave under such circumstances likely *would* be subject to a § 1983 challenge. In short, the Magistrate Judge's analysis is correct, and Plaintiffs' objection must be overruled.

### ii.    *Failure to Train on the Right to Bear Arms*

Plaintiffs next argue that the Magistrate Judge erred in finding that "Plaintiffs fail[ed] to show how LPD's training program [regarding the right to bear arms] was inadequate" or how

---

[2] Plaintiffs' attempt to distinguish *Rice* away is unavailing. (*See* Dkt. 39 at 4.) It is true that, unlike in *Rice*, the officers in this case did not observe Cuellar holding the gun to his head and there was no evidence that Cuellar had been drinking. However, Cuellar's self-reported pill ingestion, highly agitated demeanor, and refusal to comply with police commands to drop his weapon were all serious exigencies that continued to exist after Cuellar told the officers to leave.

any alleged "inadequacy was causally linked to Cuellar's death." (Dkt. 38 at 29; *see* Dkt. 39 at 5–6.) In Plaintiffs' view, LPD's training is inadequate because it fails to teach officers about what Plaintiffs describe as citizens' "unassailable" Second Amendment "right to possess a handgun in their home for self defense." (Dkt. 39 at 5.) They contend that better training on that unassailable right would have "caution[ed Officer Hernandez] against shooting" Cuellar. (*Id.*) First, Plaintiffs' characterization of the Second Amendment is inaccurate as a matter of law; the right to bear arms is not absolute, even within one's home, *see District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), and it does not prevent police officers from disarming or even shooting a citizen who poses a danger to himself or others, *see Garner*, 471 U.S. at 11.

Second, Plaintiffs fail to establish a direct causal link between LPD's allegedly deficient Second Amendment training and Cuellar's death. As the Magistrate Judge noted, it is difficult "to imagine a counterfactual in which training on the right to legally own and possess a firearm would keep an officer from using deadly force when faced with an imminent threat to officer safety." (Dkt. 38 at 29.) Even assuming that Cuellar did not in fact raise his arm as if to shoot, the Court cannot see—and Plaintiffs do not explain—how legal training on the Second Amendment would improve an officer's ability to evaluate the level of threat posed by a noncompliant, suicidal citizen holding a firearm. *See Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (noting that it is not necessary for a suspect to "raise his weapon, discharge the weapon, or even point it at the officers" to create an objectively reasonable fear justifying deadly force). Finally, Plaintiffs' do not contest the Magistrate Judge's finding that they failed to establish deliberate indifference, a necessary component of any failure-to-train claim. (*See* Dkt. 38 at 29.) *Harris*, 489 U.S. at 389–90.

### *iii. Failure to Train on Objective Reasonableness Standard*

Plaintiffs next object to Magistrate Judge Kazen's recommendation that the Court grant summary judgment on Plaintiffs' claim that LPD's use-of-force training was constitutionally deficient. (Dkt. 39 at 6; *see* Dkt. 38 at 31.) As an initial matter, the Court notes that Plaintiffs raised this failure-to-train claim for the first time in their summary-judgment response. (*See* Dkt. 26 at 37–38.) Before that, Plaintiffs had cast the claim as a policy or practice of using excessive deadly force. (Dkt. 1 at 8.) Arguably, then, the Court should not consider the failure-to-train claim now. *See Cutrera*, 429 F.3d at 113 ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.").

Regardless, Plaintiffs have failed to establish even the first prong of the failure-to-train inquiry—the existence of inadequate training procedures. *See Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996). Plaintiffs claim that LPD incorrectly trains its officers that they may use deadly force whenever they subjectively believe that it is justified. (Dkt. 39 at 6.) If true, this allegation would indeed establish a violation of the long-recognized *objective* reasonability standard. *See Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)) (noting that the determination "is one of 'objective reasonableness,' not subjective intent").

However, the only evidence Plaintiffs offer in support of their failure-to-train claim is Chief Garner's deposition testimony that an officer may use deadly force if he "feels his life is in danger . . . and can articulate it." (Dkt. 26, Attach. 1 at 142; *see* Dkt. 39 at 6.) This is indeed an incorrect statement of the law, but it does not constitute a Department-wide training policy or procedure. For one thing, a close reading of the deposition transcript indicates that Chief Garner

likely did have a correct understanding of the reasonableness standard but was confused by the difference between the terms "objective" and "subjective." (Dkt. 26, Attach. 1 at 142–44; *see* Dkt. 38 at 30.) Regardless, Plaintiffs do not allege that Chief Garner's misstatement is reflected in any official training policy, any persistent and widespread LPD practice, or any single act performed by a final policymaking authority. *See Burge II*, 336 F.3d at 369; *Sanders-Burns*, 594 F.3d at 381. Because Plaintiffs have failed to produce evidence on an essential element of their claim, Defendants are entitled to summary judgment. *Lincoln Gen.*, 401 F.3d at 349.

**B.     Defendants' Objections**

**1.     Factual Dispute Regarding Cuellar's Stance in Relation to Defendant Hernandez**

Once a defendant asserts qualified immunity, the plaintiff must show that (1) he has adequately alleged a constitutional violation, and (2) the right allegedly violated was "clearly established" at the time of the underlying events. *Saucier*, 533 U.S. at 201. Defendants' first objection pertains to the first element of this two-part inquiry. Magistrate Judge Kazen found that there remained several genuine disputes of material fact regarding the events leading up to the shooting, including whether Cuellar "turned toward Hernandez" or instead remained still throughout the encounter. (Dkt. 38 at 10.) If all those facts were resolved in Plaintiffs' favor, a reasonable juror could find that Officer Hernandez's use of deadly force was objectively unreasonable. (*See id.* at 7–10.) Thus, the Magistrate Judge concluded, Plaintiffs had adequately alleged a constitutional violation. (*Id.* at 10.)

Defendants now argue that there is no genuine dispute about whether Cuellar turned toward Officer Hernandez. (Dkt. 40 at 2.) Defendants point out that Plaintiffs' only evidence for the contention that Cuellar did *not* turn toward Hernandez is Plaintiff Dora Cuellar's declaration, in which she stated that her son remained still throughout the encounter. (*Id.* at 3; *see* Dkt. 26,

Attach. 1 at 215.) In that same declaration, however, Mrs. Cuellar admitted that her son was *already* facing Hernandez when she arrived on the scene. (Dkt. 26, Attach. 1 at 215.) Because "Mrs. Cuellar only witnessed the events that took place after . . . Cuellar exited his room and was already facing Hernandez," Defendants argue, her declaration cannot create a factual dispute about when or how her son turned toward the officers. (Dkt. 40 at 3.)

The Court disagrees. It is true that Mrs. Cuellar did not witness her son exit his bedroom. According to Plaintiffs, however, she was on the scene for at least twelve seconds before any shots were fired. (Dkt. 26 at 14–15; *see* Dkt. 41 at 3–5.) Regardless of Cuellar, Jr.'s orientation toward the officers at the time of Mrs. Cuellar's arrival, Mrs. Cuellar's contention that he did not move for those twelve seconds before he was shot raises genuine doubt about whether Officer Hernandez had probable cause to believe that he posed an immediate threat. Even if Hernandez would have been justified in shooting Cuellar when he exited the bedroom and *initially* turned toward her, Plaintiffs' allegation that Cuellar then remained "frozen" could lead a reasonable jury to conclude that any threat Cuellar posed had passed by the time he was shot. *See Lytle v. Bexar Cty.*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."). Accordingly, the Court agrees with the Magistrate Judge that there remains a genuine dispute of material fact about whether Cuellar turned toward Hernandez just before she fired.

### 2.     Magistrate Judge's Alleged Error in Findings on Qualified Immunity

Defendants next object that Magistrate Judge Kazen erred by "denying qualified immunity" without "consider[ing] the reasonableness of Hernandez' action from her perspective during the tense and chaotic situation she confronted." (*Id.* at 7.) Even under Plaintiffs' version of the facts, Defendants contend, Officer Hernandez "could have reasonably believed . . . that

shooting Cuellar was necessary to stop imminent, continuing threats" to her own or others' lives. (*Id.* at 15.)

Defendants misunderstand the nature of the summary-judgment inquiry. Magistrate Judge Kazen did not *deny* qualified immunity as a final matter or *find* that the officers violated Cuellar's constitutional rights. He merely concluded that there remained genuine disputes of material fact bearing on whether Hernandez's actions were reasonable. (*See* Dkt. 38 at 8.) In considering Defendants' summary-judgment motion, the Magistrate Judge was required to view the facts in the light most favorable to Plaintiffs and draw all reasonable inferences in their favor. *Distribuidora Mari Jose*, 738 F.3d at 706. His recommendation to deny summary judgment on Plaintiffs' claims against the officers does not constitute a finding that no officer "could have reasonably believed" Defendants' conduct was justified; it is merely a recognition that a jury *could* make that finding at trial. Accordingly, Defendants' second objection must be overruled.

### 3. Clearly Established Law at Time of the Shooting

The Magistrate Judge correctly determined that, viewing the evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could conclude that Officer Hernandez's use of deadly force violated Cuellar's Fourth Amendment rights. (Dkt. 38 at 10.) *See supra* pp. 16–17. However, to defeat Officer Hernandez's defense of qualified immunity, Plaintiffs must still show that the contours of the specific right allegedly violated were "clearly established" at the time of the shooting. *Saucier*, 533 U.S. at 201.

Magistrate Judge Kazen found that if, as Plaintiffs claim, Cuellar did not turn toward the officers or raise his weapon hand, then Officer Hernandez's use of deadly force violated clearly established law. (Dkt. 40 at 16–20; *see* Dkt. 38 at 11–12.) By the time of the shooting, he stated, "Fifth Circuit precedent had clearly established that the Fourth Amendment prohibited an officer

responding to a welfare check from shooting a man with no criminal history in his own home, standing still with a gun at his side and finger off the trigger, posing no immediate threat to the officer or to any others in the area." (Dkt. 38 at 11–12.) The Magistrate Judge based this finding primarily on *Reyes v. Bridgwater*, 362 F. App'x 403 (5th Cir. 2010), a case Defendants contend is too factually dissimilar from this case to make it "sufficiently clear [to] every reasonable officer . . . that" opening fire would violate Cuellar's right to be free from the excessive use of deadly force.[3] *Mullenix*, 136 S. Ct. at 308. (*See* Dkt. 40 at 17–18.)

The Court agrees with Defendants. To provide Officer Hernandez fair warning of the alleged unconstitutionality of her conduct, there must have been a "controlling authority—or a robust consensus of persuasive authority—that define[d] the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371–72 (5th Cir. 2011) (internal quotation marks omitted); *see Mullenix*, 136 S. Ct. at 308 (quoting *Saucier*, 533 U.S. at 205) (noting that the need for factually similar precedent is especially important in excessive-force cases, where it can be particularly "difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts").

In *Reyes*, the Fifth Circuit held that an officer was not entitled to summary judgment on qualified-immunity grounds because he could not have reasonably believed a man standing in his own kitchen posed an immediate threat simply because he disregarded the officer's orders to drop his weapon. *Reyes*, 362 F. App'x at 408. However, one key factual distinction deprives

---

[3] The Magistrate Judge also cited two district court cases, one of them unpublished. (Dkt. 38 at 12.) In response to Defendants' objections, Plaintiffs likewise cited a number of district court cases, most from outside the Fifth Circuit. (Dkt. 41 at 5–7.) However, for qualified-immunity purposes, only the Supreme Court or the courts of appeals can generate "clearly established law." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044–45 (2015); *see Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004) (Where "neither the Supreme Court nor this court has delineated the contours of" the right in question, officials' conduct does "not violate clearly established law of which reasonable officers should have known.").

*Reyes* of the "high degree of particularity" required to defeat qualified immunity: the subject in *Reyes* was holding a knife, not a gun. *Id.* at 407; *see Mullenix*, 136 S. Ct. at 312 (cautioning courts against reasoning analogically from cases meaningfully distinct on the facts). As the *Reyes* court itself observed, "the immediacy of the risk presented by a man armed with a kitchen knife at his side is far less than that of a man armed with a gun" because "a gun can kill instantaneously at [a long] distance," while someone armed with a knife must "either advance toward [the officer] or at least raise the knife before he could inflict any harm." 362 F. App'x at 407. In fact, the court's extended gun-versus-knife discussion suggests that it would not have reached the same conclusion had the subject been in possession of a firearm. *Id.*

Given this distinction, the Court cannot say that Officer Hernandez's conduct violated clearly established law. To the contrary, there is considerable precedent suggesting that an officer may be justified in using deadly force against a subject holding a firearm even if the subject never raises the weapon toward the officer. *See, e.g.*, *Ramirez*, 542 F.3d at 129 (noting that it is not necessary for a suspect to "raise his weapon, discharge the weapon, or even point it at the officers" to create an objectively reasonable fear justifying deadly force). Moreover, there is some question whether *Reyes* could constitute "clearly established" law even if its facts were more closely comparable. *Reyes* is an unpublished opinion, and, as the *Reyes* court itself noted, "unpublished opinions are not precedent." 362 F. App'x at 408 n.6; *see Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) ("Since unpublished opinions are not even regarded as binding precedent . . . , such opinions cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity.").

Regardless, Plaintiffs argue that the Fifth Circuit's 2009 opinion in *Manis v. Lawson* might provide an independent source of clearly established law precluding qualified immunity.

(Dkt. 41 at 5; *see* Dkt. 38 at 12.) As an initial matter, the facts of *Manis* are dramatically different from the facts of the case here. *Manis* involved a subject seated in a car who refused officers' commands to show his hands and appeared to reach under his seat, as if searching for a firearm. 585 F.3d at 845. The Fifth Circuit held that regardless of whether there was actually a weapon under the seat, the subject's sudden reaching motion justified the use of deadly force. *Id.* Both the Magistrate Judge and Plaintiffs assert that in so holding, the court of appeals established a clear requirement that a "suspect [must] display a threatening '*Manis* act' before it is objectively reasonable to use deadly force." (Dkt. 38 at 12 (quoting *Hostetter v. Gillock*, 2017 WL 2390226, at *6 (N.D. Tex. May 2, 2017)); Dkt. 41 at 5.)

Having reviewed *Manis* and its progeny, the Court finds this statement overly categorical. Although the Fifth Circuit has occasionally referred to a "*Manis* act" as "the act justifying deadly force," it has not articulated a rule that a subject holding a firearm must make some sudden threatening movement before officers may fire. *See Pratt*, 822 F.3d at 188. The closest it came was in its first opinion in *Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015). There, two police officers had opened fire on a suicidal young man who had a gun pressed to his own head. 802 F.3d at 755–56. The Fifth Circuit held that the officers were not entitled to qualified immunity at the summary-judgment stage, in part based on its observation that "[w]hen we have found officers justified for shooting suicidal people who were armed with guns, we have depended on the victim's *additional* threatening '*Manis*' acts and disobedience of police commands, which elevated the immediacy and severity of the danger." *Id.* at 759.

This statement cannot constitute "clearly established" law because it is dicta, and "clearly established law comes from holdings, not dicta." *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019). Moreover, it is far too general to have given Officer Hernandez "fair warning" that

deadly force would violate the Fourth Amendment under the particular circumstances she faced during her encounter with Cuellar. *Hope v. Pelzer*, 536 U.S. 730, 740 (2002). As the Supreme Court admonished in *Mullenix*, courts must be careful to avoid "defin[ing] clearly established law at a high level of generality." 136 S. Ct. at 308. Indeed, the Supreme Court appeared to recognize *Cole*'s overbreadth when it vacated the Fifth Circuit's 2015 opinion with the specific directive to consider *Mullenix* on remand. *Hunter v. Cole*, 137 S. Ct. 497 (2016).

On remand, the Fifth Circuit reaffirmed its earlier holding in *Cole* denying qualified immunity, 905 F.3d 334 (2018), but the case was subsequently set for rehearing en banc, 915 F.3d 378 (2019). It was not until August 2019 after the case was reheard en banc, the Fifth Circuit again affirmed the district court's denial of summary judgment on the issue of qualified immunity. *Cole v. Carson*, 2019 WL 3928715, *8 (5th Cir. Aug. 20, 2019). Certainly, no statement in a vacated opinion whose very holding—until recently—was contested by the court that issued it could be construed as "sufficiently clear that every reasonable official would have understood" it. *Reichle*, 566 U.S. at 663.

In short, despite the existence of genuine disputes of material fact regarding the reasonability of her use of deadly force against Cuellar, Officer Hernandez is entitled to qualified immunity because the contours of the right she allegedly violated were not clearly established at the time of the shooting. *See Pearson*, 555 U.S. at 232. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' excessive-force claim. *See id.* at 245; *Brosseau v. Haugen*, 543 U.S. 194, 199–201 (2004). The Court therefore sustains Defendants' final objection to the R&R.

## **Conclusion**

For the foregoing reasons, the Court concludes that Magistrate Judge Kazen's Report and Recommendation (Dkt. 38) should be and is hereby ACCEPTED IN PART. Plaintiffs'

objections to the R&R (Dkt. 39) are OVERRULED. Defendants' objections (Dkt. 40) are OVERRULED IN PART. Only Defendants' final objection regarding the existence of clearly established law is SUSTAINED.

Accordingly, Defendants' motion for summary judgment (Dkt. 24) is GRANTED IN PART. Plaintiffs' claims against the City of Laredo, Plaintiff Dora Cuellar's bystander claim, and Plaintiffs' excessive-force claim against Defendant Hernandez are DISMISSED WITH PREJUDICE. Only Plaintiffs' invasion-of-privacy claim against Defendants Hernandez and Gonzalez remains for trial.

IT IS SO ORDERED.

SIGNED this 16th day of September, 2019.

_____
Diana Saldaña
United States District Judge